IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

K.V.,[1]

        Plaintiff,

vs.                                Case No. 19-1249-SAC

ANDREW SAUL,
Commissioner of the Social
Security Administration,

        Defendant.

**<u>MEMORANDUM AND ORDER</u>**

    On January 8, 2016, plaintiff filed applications for social security child insurance disability benefits and for supplemental security income benefits. Plaintiff alleged a disability onset date of January 8, 1996. The applications were denied initially and on reconsideration. An administrative hearing was conducted on May 8, 2018. The administrative law judge (ALJ) considered the evidence and decided on August 24, 2018 that plaintiff was not qualified to receive benefits. This decision has been adopted by defendant. This case is now before the court upon plaintiff's request to reverse and remand the decision to deny plaintiff's applications for benefits.

---

[1] The initials are used to protect privacy interests.

I. STANDARD OF REVIEW

To qualify for disability benefits, plaintiff must establish that before he reached the age of 22 he was "disabled" under the Social Security Act. To be "disabled" means that the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The court must affirm the ALJ's decision if it is supported by substantial evidence and if the ALJ applied the proper legal standards. See Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). "Substantial evidence" is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). This standard is "not high," but it is "more than a mere scintilla.'" Id. (quoting Consolidated Edison, 305 U.S. at 229). It does not require a preponderance of the evidence. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The court must examine the record as a whole, including whatever in the record fairly detracts from the weight of the defendant's decision, and on that basis decide if substantial evidence supports the defendant's decision. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) (quoting Casias v. Secretary of Health & Human Services, 933 F.2d 799, 800-01 (10th

Cir. 1991)). The court may not reverse the defendant's choice between two reasonable but conflicting views, even if the court would have made a different choice if the matter were referred to the court de novo. Lax, 489 F.3d at 1084 (quoting Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004)). The court reviews "only the sufficiency of the evidence, not its weight." Oldham v. Astrue, 509 F.3d 1254, 1257 (10th Cir. 2007).

II. THE ALJ'S DECISION (Tr. 11-24).

There is a five-step evaluation process followed in these cases which is described in the ALJ's decision. (Tr. 12-13). First, it is determined whether the claimant is engaging in substantial gainful activity. Second, the ALJ decides whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments which are "severe." At step three, the ALJ decides whether the claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Next, the ALJ determines the claimant's residual functional capacity and then decides whether the claimant has the residual functional capacity to perform the requirements of his or her past relevant work. Finally, at the last step of the sequential evaluation process, the ALJ determines whether the claimant is able to do any other work considering his or her residual functional capacity, age, education and work experience.

In steps one through four the burden is on the claimant to prove a disability that prevents performance of past relevant work. Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006). At step five, the burden shifts to the Commissioner to show that there are jobs in the economy with the claimant's residual functional capacity. Id. In this case, the ALJ decided plaintiff's application should be denied at the fifth step of the evaluation process.

The ALJ made the following specific findings in his decision. First, plaintiff was born in 1996 and had not reached the age of 22 as of the alleged onset of his disability. Second, plaintiff has not engaged in substantial gainful activity since January 8, 1996, the alleged onset date. Third, plaintiff has the following severe impairments: autism/pervasive developmental disorder/Asperger's syndrome; major depressive disorder; anxiety; attention deficit disorder (ADD) diagnosis; scoliosis; and allergies. Fourth, plaintiff does not have an impairment or combination of impairments that meet or medically equal the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Fifth, plaintiff has the residual functional capacity (RFC) to perform a range of medium work as defined in the Dictionary of Occupational Titles. Also, plaintiff:

> should avoid all pulmonary irritants . . . as well as
> hazards, including use of moving machinery and exposure
> to unprotected heights. He is able to understand,

> remember, and carry out simple, routine, repetitive tasks, in a work environment free of fast-paced production requirements, involving only simple work-related decisions, with few, if any, workplace changes. He should have no interaction with the public, but can tolerate frequent interaction with coworkers and supervisors.

(Tr. 16).

Sixth, the ALJ found that plaintiff has no relevant work, a limited education, and is able to communicate in English. Finally, based upon the testimony of a vocational expert, the ALJ decided that considering plaintiff's age, education, work experience and residual functional capacity, plaintiff could perform jobs that exist in significant numbers in the national economy, such as counter supply worker, linen room attendant, and lamination assembler.

III. DISCUSSION

A. Credibility

Plaintiff's first argument to reverse and remand the decision to deny benefits is that the ALJ failed to give good reasons to discredit plaintiff's allegations regarding the frequency and intensity of his mental limitations. Doc. No. 11, p. 14. The court recognizes that credibility determinations are generally the province of the ALJ and binding on the court. Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983); Angelina B. v. Saul, 2019 WL 3318181 *3 (D.Kan. 7/24/2019). Credibility findings, however, "'should be closely and affirmatively linked to substantial

5

evidence and not just a conclusion in the guise of findings.'" Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995)(quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)).

1. Plaintiff's testimony

Plaintiff testified that he cannot work because he shuts down with any kind of stress. He feels overwhelmed and has physical symptoms such as sweating, nausea and headaches. According to plaintiff, this caused him to drop out of high school.

Plaintiff does not have a driver's license and has not tried to get one. His parents drive him. He does not use public transportation.

At the time of the administrative hearing, plaintiff was not taking medication for anxiety, although he testified that he had taken several medications for anxiety previously. He stated that he stopped taking the medications because of bad reactions, such as headaches. He also stated that he would like to see his mental health case manager more, but that he and his mother cannot afford it because it is no longer paid for. Plaintiff testified that he had one friend that he sees a few times a year and that mainly he sleeps all day and plays video games a little bit.

Plaintiff stated that he can't find the willpower to get up and do anything; that he deals with suicidal thoughts on a daily basis; and that he has an absence of motivation. He said that sometimes he has crying spells if he gets overwhelmed or he may

scream or jump around or lay down. Plaintiff also stated that he is easily distracted and loses his attention.

## 2. Credibility findings

The ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not "entirely consistent with the medical evidence and other evidence in the record." (Tr. 17). The ALJ noted that plaintiff's IQ testing and achievement scores showed him functioning in the average range. (Tr. 17). He also noted that plaintiff was fully oriented and had little or no problems with the mathematical tasks he was given during a consultative examination. (Tr. 18). Furthermore, his memory function, attention and concentration tested as average or above average, and plaintiff's overall memory function and comprehension of social norms and expectations was good. (Tr. 18). The ALJ stated that Dr. Pulcher, the consultative examiner, observed that plaintiff made quite good eye contact and that plaintiff's verbal skills and pattern of communication were well within normal limits. (Tr. 18). This appears to have been Dr. Pulcher's observation and not an objective test finding.

The ALJ summarized his findings as follows:

> [Plaintiff's] allegations of total disability are out of proportion with the medical and other evidence of record. As previously noted, [plaintiff's] allegations are generally consistent with his complaints and reports to his treatment providers. However, other than his subjective reports, there is little evidence to support the severity and degree of limitation [plaintiff]

7

> asserts. [Plaintiff's] participation in treatment and compliance with medications has been very sporadic and inconsistent, and when taking medications even somewhat consistently treatment records indicate that his symptoms and functioning are significantly better. Moreover, formal testing shows that the claimant is functioning in the average range intellectually, and mental status examinations have not revealed any serious chronic cognitive deficits, particularly when he takes his medications more consistently. Treatment records also do not document any serious deficits in the claimant's ability to interact or communicate with others, beyond his own reports.

(Tr. 18-19).

### 3. Other evidence in the record

The record shows that in spite of plaintiff's intellectual capacity, his own goal-setting, and the help and encouragement of his mother and mental health team, at the age of 22 plaintiff still had not finished public high school, or completed online courses to achieve a high school degree or a GED. Plaintiff has frequently exhibited poor hygiene and depressive symptoms, such as oversleeping and isolation. Over the years, plaintiff has had extensive mental health therapy or guidance from a case manager, therapist, psychiatrist and others. Their records do not demonstrate much progress.

Bill Seeberger, plaintiff's case manager for approximately 3 years, saw plaintiff one or two times per week. He observed that plaintiff struggled with hygiene and self-care, and struggled to follow through with "appointments, cooking/cleaning and taking medications." (Tr. 1265). He stated that plaintiff cannot

8

complete written tasks on his own, and requires support in social situations to the extent that he refuses to go into stores. Id. He further commented that plaintiff lacks the energy and ability to motivate himself due to depression. (Tr. 1267). He recorded that overall plaintiff had difficulty with: communicating, comprehending, isolating himself, anxiety, sleeping, staying on task, irritability, handling stress, concentration, handling changes in routine, obsessive behaviors, bathing and grooming. (Tr. 1265). The ALJ discounted these "casual" observations. (Tr. 20). But, the ALJ he did not give any reasons to question thoughts drawn from extensive contact with plaintiff regarding plaintiff's communication, anxiety, irritability, concentration, hygiene, self-care, missed appointments, social reticence and lack of follow through in a variety of areas. These observations were corroborated to some extent by the comments of Kira Harkins, another mental health worker with a long relationship with plaintiff. She commented that plaintiff had "anger outbursts," experienced "serious depressive symptoms," had "difficulty maintaining adequate hygiene," "typically doesn't feel comfortable in social settings," and "tends to isolate himself." (Tr. 963-64).

As already mentioned, Dr. Pulcher conducted a consultative examination of plaintiff and concluded that plaintiff's "presentation is essentially consistent with the record provided

9

for review, in that he is of average intellectual ability but has an autism spectrum disorder which was diagnosed at a young age after he stopped speaking, <u>and which has resulted in social and communication and interpersonal dysfunction throughout his life</u>." (Tr. 930)(emphasis added). Dr. Pulcher concluded:

> [Plaintiff] is able to understand and carry out simple instructions, and his attention and concentration are within normal limits. <u>His autistic limitations limit his ability to interact productively with others, and would definitely negatively impact adaptability and persistence in work settings. His depression with irritability and agitation would also be problematic in virtually any work setting.</u>

(Tr. 930)(emphasis added). The ALJ gave the underscored sentences of this excerpt "little weight" as being "vague and conclusory" in that Dr. Pulcher did not "provide any specific functional limitations as to what types of setting [plaintiff] could adapt to, or persist in, or how frequently he could tolerate social interaction." (Tr. 20).

In contrast, the ALJ gave "great weight" to the opinions of state agency consultants, noting their comprehensive review of the record and familiarity with disability determination standards. (Tr. 20). He also found their conclusions consistent with the evidence of record "including the objective results of formal testing and mental status examinations and [plaintiff's] poor compliance with medications and treatment." (Tr. 20). One of these consultants stated that mental health records showed that

10

plaintiff had been diagnosed with bipolar disorder, severe depression with psychotic features and pervasive developmental disorder. (Tr. 98). "Attention and concentration were distractible and impaired." (Tr. 98). He further noted that plaintiff had endorsed paranoid delusions during a mental status exam. (Tr. 98). He recounted that school records showed that plaintiff tested for clinically significant depression "indicating a high level of internal distress such as depressed mood, low self-esteem, headaches, lethargy and pain." (Tr. 99). Plaintiff also registered elevated scales of hyperactivity and attention problems as well as withdrawal. (Tr. 99). The state agency consultant further remarked as follows:

> <u>Evidence shows that despite medication and psychotherapy, the [plaintiff] continues to experience fluctuating mood [symptoms] and limitations of daily activities. Due to autism he experiences deficits of his ability to function socially and in specific environments.</u> He participated in special education under an IEP. The severity of impairments does not meet or equate the criteria of the listings. The [plaintiff] displays average intellect and communication within normal limits. [Activities of daily living, school records and medical evidence of record] show that his interests and daily activities are not narrowly restricted. <u>He experiences . . . ongoing [symptoms] of depression despite treatment.</u> With regard to [activities of daily living], the function report and evidence show moderate restriction due to his [medically determinable impairments] including poor personal care and hygiene, overly sleeping, long time periods to complete simple chores, and few hobbies and interests. [Plaintiff] only goes out with his mother to shop for short periods of time. He cannot drive and does not use public transportation. [Plaintiff] is moderately impaired in his ability to appropriately socially

11

> interact. <u>Although psychiatric records report he is cooperative in 1/1 exam settings, the [consultative examiner] reports that the [plaintiff] experiences problematic anger and irritability. The [plaintiff] also reports social anxiety and trouble functioning in social environments due to [autism spectrum disorder], which is consistent with the records and the disorder. He has few friends, limited mainly to online contact, and is socially isolative.</u> He does not go in public alone. Regarding concentration and persistence, the [plaintiff] displays normal attention and concentration on tasks, as well as normal memory, as shown by the [consultative examiner]. <u>Medical evidence of record] shows, however, that the [plaintiff] experiences agitation, anger, irritability and reduced energy that could be expected to moderately impair his ability to perform more complex tasks. [He is] moderately limited in his ability to adapt to changes in work environments due to [autism spectrum disorder] and mood disturbance [symptoms]. He has additional adaptive limitations of not being able to use public transportation or travel unaccompanied to unfamiliar places. He therefore retains the ability to perform simple, repetitive tasks in an environment without demand for high production or fast pace, with structure and little change in routine, and with only infrequent interactions with the public, supervisors or co-workers.</u>

(Tr. 99-100)(emphasis added).

### 4. Analysis

Plaintiff's testimony did not assert an intellectual or cognitive deficit. Therefore, the court agrees with plaintiff that the objective tests of plaintiff's IQ and calculation and comprehension skills, upon which the ALJ relies, are not substantially material to the credibility of plaintiff's testimony. Defendant does not seem to argue otherwise in the response brief.

12

The medical opinions on record also do not substantially support the ALJ's conclusions regarding plaintiff's credibility. Dr. Pulcher and the state agency consultants indicated that plaintiff's presentation was consistent with his complaints and history. They further indicated that plaintiff's symptoms exist despite treatment. They each gave opinions that plaintiff would have significant difficulty interacting in a work setting with the public, supervisors or co-workers.[2]

Despite the "great weight" given to the state agency consultants' opinions, the ALJ did not accept their determination that plaintiff could have only infrequent interactions with supervisors and co-workers. (Tr. 60, 99-100). The ALJ reasoned that the record did not document that plaintiff had any serious difficulty communicating or interacting with his treatment providers or Dr. Pulcher. (Tr. 20). This, however, ignores the statements of Seeberger and Harkins, two of plaintiff's most frequent mental health contacts, who noted difficulty with communication and irritability among other issues already mentioned.[3] It also ignores Dr. Pulcher's statement that plaintiff's presentation during the consultative examination was

---

[2] Although the ALJ gave little weight to Dr. Pulcher's opinion and great weight to the state agency consultant's opinion, the court does not see a substantial difference between the two.

[3] The ALJ states that the observations of Seeberger and Harkins at Tr. 1265-1267 and 963-64 are not well supported by the medical evidence. (Tr. 20). The ALJ, however, does not specifically identify the medical evidence which contradicts their observations.

13

"essentially consistent with records provided for review, in that he . . . has an autism spectrum disorder . . . which has resulted in social and communication and interpersonal dysfunction throughout his life." (Tr. 930).

Finally, the ALJ has referred to situational stressors[4] that impact plaintiff's symptoms and to plaintiff's playing video games and talking to friends online. (Tr. 18). This information was available to the mental health personnel and consultants who gave opinions for the record. There is no indication that it contradicts plaintiff's testimony or that it substantially supports the ALJ's conclusion that plaintiff's claims of disability are out of proportion to the medical and other evidence of record.

B. <u>Medication noncompliance</u>

The ALJ relied upon plaintiff's noncompliance with prescribed medication to evaluate plaintiff's credibility and to evaluate the impact of plaintiff's conditions upon his residual functional capacity. The ALJ stated:

> [T]reatment records . . . document poor compliance with medications and treatment. Although [plaintiff] often reported stopping medications due to side effects, there is no support for these claims, and his overall poor compliance does not show that he made genuine efforts to try other medications. In fact, [plaintiff] has not been taking any medications for most of the past two years, despite numerous indications in the record that when [plaintiff] does take his medications more

---
[4] The record includes references to moving residences, parents' divorce, financial pressures, pets' poor health, hoarding behavior and other issues.

14

> consistently, he is able to feel and function better, with more energy and less depression. Mental status examinations also often reflect that he is attentive and cooperative, alert and oriented, and his cognitive functions are in tact when he takes his medications more consistently. If [plaintiff's] symptoms were truly as persistent and debilitating as he asserts, one would expect that he would have made a greater effort to follow through with treatment and take his medications as prescribed.

(Tr. 18)(citations to exhibits omitted).

In <u>Heggie v. Berryhill</u>, 2018 WL 658712 (D.Kan. 2/1/2018), the court considered a similar situation. The plaintiff in <u>Heggie</u> alleged a mental health disability. In evaluating the plaintiff's symptoms, the ALJ found that the plaintiff regularly stopped taking his medications, despite repeatedly reporting they were effective, because he forgot to pick them up and because he did not see the point in taking them. The ALJ in <u>Heggie</u> further determined that the prescribed medication was generally effective and that the plaintiff's failure to regularly take the medication showed the plaintiff did not find his mental symptoms so severe and disabling to require continuing treatment and medication.

The court reversed and remanded the decision to deny benefits in <u>Heggie</u> because the ALJ made no finding that the plaintiff would be able to return to work if he took the prescribed medication and because the ALJ did not consider whether forgetting the medication or failing to see the point of taking it was the result of the plaintiff's mental impairment and therefore justifiable. <u>Id.</u> at

15

*4. These are two of the four factors listed by the Tenth Circuit in Frey v. Bowen, 816 F.2d 508 (10th Cir. 1987) for consideration when noncompliance with prescribed or recommended treatment is an issue.

As in Heggie, the ALJ in this case did not make a finding that plaintiff could return to work if he took his medication as prescribed. Perhaps this was because the ALJ considered plaintiff able to work even without taking prescribed medication. As noted above, however, the ALJ's assessment of plaintiff's RFC does not incorporate the limitations suggested by Dr. Pulcher or the state agency consultants, and it lacks support in the other evidence in the record. And as in Heggie, the ALJ made no consideration of whether plaintiff's failure to take medication was the result of plaintiff's mental impairment.[5]

The court applied similar reasoning in Potter v. Astrue, 2012 WL 5499509 *5 (D.Kan. 11/13/2012) where the plaintiff's decision to stop depression medication and other prescribed or recommended treatment was considered by the ALJ as grounds to discredit the plaintiff's testimony and to deny benefits. The court reversed the decision to deny benefits because the ALJ did not consider whether the medication and other measures would restore the

---

[5] The court further notes that plaintiff's numerous mental health appointments indicate that he has had a serious regard for his symptoms.

16

plaintiff's ability to work and whether her noncompliance was justified.

Defendant has cited two unpublished Tenth Circuit cases for the proposition that the Frey factors do not need to be applied when noncompliance is merely considered as a credibility factor as opposed to grounds for denying disability. These cases are Thomas v. Berryhill, 685 Fed.Appx. 659, 663 (10th Cir. 2017) and Johnson v. Colvin, 640 Fed.Appx. 770, 774 (10th Cir. 2016). We find these cases to be distinguishable. In Thomas, the court was discussing the evaluation of a doctor's opinion when that doctor stated that the plaintiff's condition would improve with physical therapy. In Johnson, the court considered several factors which discounted the plaintiff's credibility and determined that while consideration of the plaintiff's noncompliance "may be problematic," the balance of credibility analysis adequately supported the ALJ's determination. 640 Fed.Appx. at 775.

C. Summary

In summary, the court finds that the ALJ's credibility findings and in turn his findings as regard plaintiff's RFC are not supported by substantial evidence.[6]

---

[6] "[C]redibility and RFC determinations are inherently intertwined." Poppa v. Astrue, 569 F.3d 1167, 1171 (10th Cir. 2009).

17

IV. Conclusion

For the above-stated reasons, the court directs that the decision of the Commissioner is reversed and that judgment shall be entered pursuant to sentence four of 42 U.S.C. § 405(g) remanding the case for further proceedings consistent with this memorandum and order.

**IT IS SO ORDERED.**

Dated this 24th day of March, 2020, at Topeka, Kansas.

<u>s/Sam A. Crow</u>
Sam A. Crow, U.S. District Senior Judge